Stephanie R. Tatar – State Bar No. 237792
**TATAR LAW FIRM, APC**
3500 West Olive Avenue, Suite 300
Burbank, California 91505
Tel. (323) 744-1146
Fax. (888) 778-5695
Stephanie@thetatarlawfirm.com

*Attorneys for Plaintiffs*
*and the proposed Class*

*Additional attorneys on signature page*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

AUSTIN RUGG, JENNIFER FISH,
and KAREN SANCHEZ,
individually and on behalf of a class
of similarly situated persons,

          Plaintiffs,

     vs.

JOHNSON & JOHNSON,

          Defendant.

Case No.  5:17-CV-5010 (BLF)

**AMENDED CLASS ACTION
COMPLAINT**

**JURY TRIAL DEMANDED**

1.     Plaintiffs Austin Rugg, Jennifer Fish and Karen Sanchez, by their attorneys, bring this class action against Johnson & Johnson ("J&J"), on their own behalves and on behalf of all others similarly situated, and allege as follows:

## INTRODUCTION

2.     Whether by an annoying patch of dry skin or an oozing rash that affects one's social life, as much as 70% of the U.S. population is allergic to at least one personal care product ingredient.  Most of these skin allergies are of unknown cause.

3.     It is extremely difficult for people to identify what ingredient they are allergic to.  Allergic reactions are attenuated in both space and time.  Some allergic reactions will not manifest until a week after exposure to the allergen.  Even worse

1 – some allergic reactions will not manifest on the body part exposed to the allergen.

2 Instead, the immune system will sometimes "remember" the first exposure and the

3 allergic reaction will develop on the body part that was *first* exposed to the allergen.

4     4.    Thus, consumers increasingly seek hypoallergenic products. Those

5 who do not suffer from skin allergies seek hypoallergenic products to avoid

6 developing a skin allergy. Those who do suffer from a skin allergy seek

7 hypoallergenic products to avoid the inflammatory cascade caused by an

8 unidentified skin allergen.

9     5.    Since its founding, J&J bases its brand as providing hypoallergenic

10 products for babies and adults.

### Baby Care Products



**JOHNSON'S Baby**

For over 125 years, JOHNSON'S® has provided safe, mild and gentle products for babies and adults. All JOHNSON'S® baby products are soap-free, hypoallergenic, dermatologist-tested and paraben-free as part of our promise to enable a healthy future for all babies. Every JOHNSON'S® product is made with the purest and highest-quality ingredients because we are committed to happy, healthy development.

Exhibit A.[1]

    6.    J&J repeats this promise on the labels of almost all its products, claiming them to be hypoallergenic. *See* Product Labels attached as Exhibits B, C.

    7.    However, despite its marketing scheme, J&J's products are chock-full of known skin sensitizers (allergens), agents that cause serious skin damage,

---

[1] Exhibit A reads:

Baby Care Products
JOHNSON'S Baby
For over 125 years, JOHNSON'S® has provided safe, mild and gentle products for babies and adults. All JOHNSON'S® baby products are soap-free, hypoallergenic, dermatologist-tested and paraben-free as part of our promise to enable a healthy future for all babies. Every JOHNSON'S® product is made with the purest and highest-quality ingredients because we are committed to happy, healthy development.
Exhibit A.

chemicals that cause serious eye damage lasting longer than 21 days, skin irritants, and eye irritants. Even more, J&J's products also contain known carcinogens, mutagens, reproductive toxins, and other chemicals extremely hazardous to human health. *See* Exhibits B, C, D, ¶¶ 89-167, *infra*.

8.     For example, J&J labels its popular "pink" baby lotion as hypoallergenic, despite the fact that it contains a smorgasbord of known skin sensitizers. Other than water, the highest ingredient by volume is ***cocamidopropyl betaine***, which was named the Allergen of the Year in 2004 by the American Contact Dermatitis Society. The second highest ingredient by volume is ***PEG-80 sorbitan laurate***, a Category 1 skin sensitizer – the highest categorization given to allergens. The so-called "hypoallergenic" product also contains ***PEG-150 distearate***, which is known to cause contact urticarial, ***sodium hydroxide***, which is known to cause dermatitis and causes serious skin corrosion, irreversibly damaging the skin. Concentrations as low as 5% cause Category 1A skin corrosion, meaning that it irreversibly damages the skin after less than 3 minutes of exposure. Corrosive reactions are typified by ulcers, bleeding, bloody scabs, and, by the end of observation at 14 days, by discoloration due to blanching of the skin, complete areas of alopecia, and scars. Even minute amounts (0.5%) are irritating to the skin and eyes. It causes Category 1 eye damage, *i.e.*, it causes serious damage to the eye tissue or serious physical decay of vision which is not fully reversible within 21 days of application. The product contains still more skin sensitizers, skin irritants, and eye irritants. *See* Exhibits B, D, ¶¶ 89-167, *infra*.

9.     This is a class action on behalf of a national class of consumers who purchased J&J's body care products that were falsely and misleadingly marketed as "hypoallergenic." These products in fact contain a shocking array of compounds known to cause allergic responses. These products are also stuffed with other chemicals that have not been analyzed for its skin sensitization potential. Finally, these products also contain a plethora of other compounds known to cause severe

skin corrosion, serious eye damage, cancer, genetic mutations, birth defects, or are otherwise toxic or hazardous to a person's skin, their overall health, or to the environment.

10.    Many of the ingredients are permitted body care products.  Yet J&J did not simply claim that its household products are "legal."  J&J falsely and misleadingly claimed that the ingredients in its products are "hypoallergenic" when they are not.

11.    By deceiving consumers about the nature, quality, and/or ingredients of its products, J&J can command a premium price, increasing consumers' willingness to pay and take away market share from competing products, thereby increasing its own sales and profits.

12.    Plaintiffs and members of the Class, as defined herein, are reasonable consumers without scientific background in the skin sensitization potential of J&J's ingredients.  As such, they lack the ability to test or independently ascertain the toxicity of a chemical, especially at the point of sale.  Reasonable consumers must and do rely on the chemicals company to honestly report the nature of the product's ingredients.

13.    Even with scientific knowledge and a close examination of the ingredients label, reasonable consumers such as Plaintiffs and the Class would not know if J&J developed a new, purified version of the offending ingredient that lacked sensitization or irritation potential.

14.    J&J further encouraged consumers to rely on its representations, marketing itself as an honest company that provides transparent and truthful information about its products' ingredients.

15.    J&J intended for consumers to rely on its representations, and hundreds of thousands of reasonable consumers, who do not generally examine in detail the ingredients disclosed in fine print on the back label of a product, did in fact so rely.

16.    As a result of their false and misleading labeling, J&J was able to sell

these products to hundreds of thousands of consumers throughout the United States and to profit handsomely from these transactions.

17.     J&J's false and misleading representations and omissions violate state and federal law, both civil and criminal, detailed more fully below, including California's Unfair Competition Law, False Advertising Law and Consumer Legal Remedies Act, New Jersey's Consumer Fraud Act and Truth-in-Consumer Contract, Warranty and Notice Act, and common law.

18.     Plaintiffs bring this action to stop J&J's deceptive and misleading practices.

## JURISDICTION AND VENUE

19.     This Court has personal jurisdiction over the parties in this case. Plaintiff Austin Rugg is a citizen of Santa Clara, California.  Plaintiff Fish is a citizen of San Francisco, California.

20.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act ("CAFA").  28 U.S.C. § 1332(d).  Jurisdiction under CAFA is met because the proposed number of putative class members exceeds 100, at least one plaintiff and one defendant are citizens of different states, and the amount in controversy, including, but not limited to the aggregate amount of relief sought by absent class members, exclusive of interest and costs, exceeds $5 million.

21.     This Court has personal jurisdiction over J&J because it is a corporation or individual with sufficient minimum contacts in California or otherwise intentionally avails itself of the laws of this State through its marketing and sales of the products at issue in California, to consumers in California, and to retailers throughout California, so as to render the exercise of jurisdiction by this Court consistent with traditional notions of fair play and substantial justice.

22.     Venue is proper in this District under 28 U.S.C. § 1391(a).  Substantial acts in furtherance of the alleged improper conduct, including the dissemination of false, misleading and deceptive information regarding the nature, quality, and/or

ingredients of the Products, occurred within this District.

23.     No other forum would be more convenient for the parties and witnesses to litigate this action.

## PARTIES

**Plaintiffs**

### A.   **Austin Rugg**

24.     Plaintiff Rugg is an individual consumer who, at all times material hereto, is a citizen of the State of California.  During the class period, in or around January 2016, Plaintiff Rugg purchased the J&J products Baby Bedtime Moisture Wash and Baby Bedtime Lotion from a Target department store located in Santa Clara, California.

25.     In deciding to make these purchases, Plaintiff Rugg saw, relied upon, and reasonably believed the label representation that the products were "hypoallergenic."  These representations were a significant reason for her purchases.

26.     Had Plaintiff Rugg known at the time that these products were not hypoallergenic as promised, he would not have purchased these products.

27.     Had Plaintiff Rugg known at the time that these products contained irritating, toxic, hazardous, or otherwise harmful chemicals, he would not have purchased these products.

28.     Plaintiff Rugg purchased, purchased more of, or paid more for, these products than he would have had he known that the products contained skin sensitizers, irritants, toxins, carcinogens, or otherwise harmful chemicals.

29.     Plaintiff Rugg faces an actual and imminent threat of future injury because he is unable to rely on J&J's representations in the future, or may purchase the mislabeled products, as is, in the future.

30.     If J&J's products were reformulated such that its representations were truthful, Plaintiff Rugg would consider purchasing J&J's products in the future.

31.     The products that Plaintiff Rugg purchased are substantially similar to

J&J's other products alleged to be falsely labeled.

**B.**    **Jennifer Fish**

32.    Plaintiff Fish is an individual consumer who, at all times material hereto, is a citizen of the State of California.  During the class period, in or around July 2017, Plaintiff Fish purchased the J&J's baby head-to-toe wash from Bed Bath & Beyond, located at 555 Ninth Street Retail Center in San Francisco, CA.  Also, in or around July 2017, Plaintiff Fish purchased J&J's baby lotion from the Babies "R" Us located at 775 Serramonte Blvd. in Colma, CA.

33.    In deciding to make these purchases, Plaintiff Fish saw, relied upon, and reasonably believed the label representation that the products were "hypoallergenic."  These representations were a significant reason for her purchases.

34.    Had Plaintiff Fish known at the time that these products were not hypoallergenic as promised, she would not have purchased these products.

35.    Had Plaintiff Fish known at the time that these products contained irritating, toxic, hazardous, or otherwise harmful chemicals, she would not have purchased these products.

36.    Plaintiff Fish purchased, purchased more of, or paid more for, these products than she would have had she known that the products contained skin sensitizers, irritants, toxins, carcinogens, or otherwise harmful chemicals.

37.    Plaintiff Fish faces an actual and imminent threat of future injury because she is unable to rely on J&J's representations in the future, or may purchase the mislabeled products, as is, in the future.

38.    If J&J's products were reformulated such that its representations were truthful, Plaintiff Fish would consider purchasing J&J's products in the future.

39.    The products that Plaintiff Fish purchased are substantially similar to J&J's other products alleged to be falsely labeled.

**C.**    **Karen Sanchez**

40.    Plaintiff Sanchez is an individual consumer who, at all times material

1    hereto, is a citizen of the State of New Jersey.  During the class period, in or around

2    February and March 2017, Plaintiff Sanchez purchased the J&J products Baby Head-

3    To-Toe Wash, Baby Powder with Soothing Aloe & Vitamin E, Baby Shampoo and

4    Baby Lotion with Shea & Cocoa Butter from a Shoprite supermarket located in Rio

5    Grande, New Jersey.

6        41.    In deciding to make these purchases, Plaintiff Sanchez saw, relied

7    upon, and reasonably believed the label representation that the products were

8    "hypoallergenic."  These representations were a significant reason for her purchases.

9        42.    Had Plaintiff Sanchez known at the time that these products were not

10   hypoallergenic as promised, she would not have purchased these products.

11       43.    Had Plaintiff Sanchez known at the time that these products contained

12   irritating, toxic, hazardous, or otherwise harmful chemicals, she would not have

13   purchased these products.

14       44.    Plaintiff Sanchez purchased, purchased more of, or paid more for,

15   these products than she would have had she known that the products contained skin

16   sensitizers, irritants, toxins, carcinogens, or otherwise harmful chemicals.

17       45.    Plaintiff Sanchez faces an actual and imminent threat of future injury

18   because she is unable to rely on J&J's representations in the future, or may purchase

19   the mislabeled products, as is, in the future.

20       46.     If J&J's products were reformulated such that its representations were

21   truthful, Plaintiff Sanchez would consider purchasing J&J's products in the future.

22       47.    The products that Plaintiff Sanchez purchased are substantially similar

23   to J&J's other products alleged to be falsely labeled.

24   **Defendant**

25       48.    Defendant J&J is an international company in the business of

26   marketing and selling consumer healthcare products, medical devices and

27   pharmaceuticals, through its more than 250 companies located in 60 countries.  See

28   http://www.jnj.com/about-jnj/company-structure.

49.     Defendant J&J is a New Jersey corporation with its principal place of business located in New Brunswick, New Jersey.  J&J manufactures and/or causes the manufacture of personal care and baby care products.  J&J labels these products under its own name, and markets and distributes the products through its online website and through retail stores in California, and throughout the United States.

## CONSUMERS ACTIVELY SEEK
## HYPOALLERGENIC BODYCARE PRODUCTS

50.     According to the Centers for Disease Control and Prevention ("CDC"), 8.8 million children (12% of U.S. children) reported skin allergies in 2012. Skin allergies are even more prevalent among young children; CDC reports that 14.2% of children between the ages of 0 and 4 suffered a skin allergy in 2012.

51.     These numbers are likely to underreport the prevalence of allergic contact dermatitis; recent studies show that somewhere between 14-70% of children suffer from skin allergies, based on positive patch skin tests.

52.     Skin allergies are similarly prevalent among adults.

53.     When skin is exposed to a sufficient amount of a chemical allergen, the skin is "sensitized."   Upon re-exposure to the allergen, the skin initiates an inflammatory cascade, causing skin changes associated with allergic contact dermatitis. These include redness, oedema (fluid retention), scaling, fissures (cracking), vesicles (fluid-filled sacs), bullae (bubble-like cavity), and eventually oozing.

54.     Contact sensitization and related skin allergies can severely affect a person's quality of life, depending on the severity and the site of skin sensitization. People suffering from noticeable skin allergies will try to hide the symptoms under clothing if possible, and if not, will avoid public spaces entirely.  In either case, skin allergies can dramatically affect a person's confidence and engagement in life.

55.     It is difficult to identify the substance causing an allergic response. Allergic contact dermatitis develops several days after exposure to a skin allergen.

Some substances do not cause symptoms until a week after exposure.

56.     Even more, once an individual is sensitized to an allergen, future contact with the allergen can trigger a response in the *original* site of sensitization. For example, if someone had an allergic response to a product used on the face, and later used a different product containing the same allergen on the legs, the allergic response will occur again on the *face* – even if the face was never exposed to the second product.

57.     When a consumer cannot identify the material to which they are allergic, allergic contact dermatitis will persist, and, it is believed, will take longer to resolve even after the cause is identified.

58.     Thus, consumers will actively seek out hypoallergenic products – to avoid a skin allergy from occurring at all and/or to prevent a known skin allergy from repeating the inflammatory cascade.

## DEFINITION OF HYPOALLERGENIC

59.      The scientific and regulatory definition of a skin sensitizer is a substance that causes sensitization by skin contact in a substantial number of persons based on human evidence or appropriate animal testing.

60.     If a skin sensitizer makes up 0.1% or more of a product, or if the product contains a sensitizer that may elicit an allergic response at concentrations smaller than 0.1% in individuals who are already sensitized to the chemical, the entire product mixture is classified as a skin sensitizer, i.e., the product causes sensitization by skin contact in a substantial number of persons based on human evidence or appropriate animal testing.

61.     A product that is a skin sensitizer is not hypoallergenic.

62.     Consumers believe and expect that a product that is labeled as hypoallergenic does not contain skin sensitizers at a concentration that could elicit an allergic response in sensitized individuals.

63.      Once skin is sensitized, even a minute amount of the chemical allergen

is enough to cause a full-blown allergic response.   Thus, consumers seeking hypoallergenic products also commonly expect that the product does not contain any skin sensitizers.

64.    All J&J's products contain substances classified by reputable authorities as skin sensitizers.  *See infra* at ¶¶ 89-167 (identifying skin sensitizers) and Exhibit B (showing which products contain these skin sensitizers).

65.    All J&J's products also contain skin sensitizers that are either present in Defendant's products at concentrations larger than 0.1%, or that may elicit an allergic response at concentrations smaller than 0.1% in sensitized individuals.

66.    J&J's products are not hypoallergenic.

67.    Thus, J&J's on-the-label promise that its products are "hypoallergenic" is false.

68.    Consumers also believe and expect that a product that is labeled as hypoallergenic contains no ingredients known to produce a negative reaction -- skin irritation, skin corrosion, eye damage, birth defects, cancer, genetic mutations, etc.

69.    J&J's products contain ingredients known to produce a negative reaction -- skin irritation, skin corrosion and/or eye damage.  *See infra* at ¶¶ 89-167.

70.    Thus, J&J's on-the-label promise that its products are "hypoallergenic" is *also* misleading.

71.    J&J knows how consumers define "hypoallergenic," and encourages this understanding.

72.        As J&J explains:

Our ingredients are carefully selected and reviewed for safety, and our product formulations are clinically evaluated with appropriate testing. We ensure each product displaying the NO MORE TEARS® or CLINICALLY PROVEN MILDNESS® trademark has the right body of research and support behind it and that claims like "hypoallergenic" and "designed gentle enough for newborns" have appropriate data behind them.

Exhibit E.

73.     Because even a *minute* amount of a chemical allergen is enough to cause a full-blown allergic response, consumers reasonably expect and believe that when a product is labeled as "hypoallergenic," this representation is true not just for the final formulation, but to every ingredient in the product.

74.     J&J knows and encourages this understanding.

75.     J&J knows that consumers rely upon it to not only test the final product formulation for basic safety, but to select only those ingredients that it considers to be safe.

76.     J&J stresses not only product safety, but *ingredient* safety. As J&J explains, "For us, safe ingredients aren't just a consideration. Safe ingredients are the focus of how our baby and beauty personal care products are created." Exhibit F.

77.     For example, as J&J explains on its website:

> We know you wouldn't use a product on your baby without researching it first. Neither would we. We examine every ingredient, combination of ingredients and the safety of our products with the level of scrutiny we would want for our own babies. Our scientists review the latest research to choose ingredients that are best for your baby.

Exhibit G.  *See also* Exhibit H, Exhibit I (discussing "Clinically Proven Mildness" seal, "Every ingredient is evaluated by safety experts.").  *See also* Exhibit J, Why is JOHNSON's Special? ("Proven scientific methods are used to assess the ingredients used in our products and to ensure, based on the evidence, that all ingredients are safe and appropriate for baby.").

78.     J&J promises that it has evaluated "every single" raw material in its products, and assures consumers that "ingredients without a full safety profile or without full composition are rejected."

## Level 2
# Toxicology Assessment

*Toxicology is about assessing safety – in our case, about the safe use of ingredients in our products. We conduct tiered assessments by accredited toxicologists and from independent safety experts.*







| | | |
|---|---|---|
| global regulatory standards our products meet or exceed | raw materials in our products – and we've evaluated every single one | ingredients without a full safety profile or without full composition are rejected |

Exhibit K. *See also* Exhibits L, M, N.

79.     As J&J explains in its "Ingredient Guidelines,"

JOHNSON'S Ingredient Guidelines

There is so much information out there; it sometimes can be difficult to feel confident you're making the best choices for your little one.

We know you wouldn't use a product on your baby without researching it first. Neither would we. We examine every ingredient, combination of ingredients and the safety of our products with the level of scrutiny we would want for our own babies.

Exhibit H.

80.     In its "Ingredient Guidelines," J&J explains that consumers can rely on it for "Selecting the Right Preservatives" ("There are lots of preservatives worldwide but only a small number meet all of our strict requirements for babies.") and that its products contain "Non-Toxic Ingredients." Exhibit H.

81.     Similarly, J&J explains in its "Ingredient Policies" that it assesses each individual ingredient in its "five-level safety assurance process."

Our Position

The ingredients we use are all thoroughly evaluated during our five-level safety assurance process. We also test each formulation to be confident that the raw materials we've selected remain safe and effective when we combine them in a product.

Exhibit O.  *See also* Exhibit P ("Our scientists ensure that the preservatives we use have been thoroughly evaluated for safety, are mild, and that we use the minimum amounts necessary to protect the product from spoiling. This is part of Our Safety & Care Commitment to you. . . .  We also evaluate any preservatives we use for mildness and the potential to cause allergies.)

82.     However, very few ingredients in J&J's products have been adequately studied for safety.  Moreover, very few have been assessed for their sensitization potential.  *See* ¶¶ 89-167, *infra*.

### J&J's FALSE REPRESENTATIONS

83.     On the products' labels, and again on its retail website, J&J represents that certain of its products are "hypoallergenic." These products, (collectively, the "Falsely Labeled Products") are all falsely labeled, as all of these products contain skin sensitizers, skin irritants, eye irritants, and other deleterious compounds.

84.     These products are:

baby bedtime moisture wash
baby head-to-toe wash
baby moisture wash
baby moisture wash with shea & cocoa butter
baby moisture wash with vanilla oatmeal
baby wash honey apple
baby head-to-toe wash
baby powder
baby powder with soothing aloe & vitamin e
baby powder with medicated zinc oxide skin protectant
baby bedtime lotion
baby cream
baby intense moisture cream
baby lotion
baby lotion with aloe & vitamin e

AMENDED CLASS ACTION COMPLAINT
14

baby lotion with shea & cocoa butter
baby lotion with vanilla oatmeal
baby bedtime lotion
no more tangles shampoo & conditioner
baby shampoo
kids detangling spray sun-ripened strawberry
baby bedtime bath
baby bedtime bath + lotion
baby wash + lotion
no more tangles shampoo
no more tangles detangling spray
head-to-toe baby cleansing cloths
head-to-toe extra moisturizing cream
head-to-toe extra moisturizing baby wash
head-to-toe baby lotion
baby powder refreshing magnolia petals
baby shampoo with calming lavender

85.     The labels of these products are attached as Exhibits B and C.

86.     Further encouraging consumers' reliance on J&J's "hypoallergenic" promise, J&J labels only *some* products as hypoallergenic, giving consumers the (false) impression that J&J carefully reviewed each ingredient in its products to ensure that the "hypoallergenic" promise was made for only those products that truly are hypoallergenic. *See, e.g.,* Exhibit Q.

87.     Yet, contrary to J&J's promise, *all* these products in fact contain known skin sensitizers.  They also *all* contain known skin or eye irritants, carcinogens, teratogens, mutagens, or pollutants.  Finally, they *all* contain substances that have not been adequately assessed for safety or skin sensitization potential.

88.     All J&J's Falsely Labeled Products contain one or more of the following chemicals.

89.     The safety profile of *acrylates copolymer* has not been thoroughly investigated.  The limited testing done by the ingredient manufacturers, however, indicates that it is a skin irritant and eye irritant, causing skin damage in less than four hours and serious irritation to the cornea, iris, conjunctiva.  It is also a suspected mutagen.

90.     In animal testing, *acrylates/C10-30 alkyl acrylate crosspolymer* was shown to be a sensitizer at concentrations as low as 2%.  It also causes eye irritation

1    that takes three days to clear.

2        91.    **Anthemis nobilis flower oil** is a known skin and eye irritant. Moreover,

3    it is classified as a Category 1 skin sensitizer, based on positive testing,

4    demonstrating that repeated skin contact can be expected to cause allergic response

5    in a substantial number of persons.

6        92.    The safety of **disodium EDTA** has not been adequately studied, and it

7    has not been found to be non-sensitizing by any reputable authority. However, based

8    on its chemical structure and similarity to other known skin sensitizers, disodium

9    EDTA is a likely skin sensitizer.  The limited testing completed also demonstrates

10   that it is a skin irritant and eye irritant, causing skin damage in less than four hours

11   and serious irritation to the cornea, iris, conjunctiva.  It is also suspected of being a

12   mutagen and reproductive toxin.

13       93.    **Glyceryl oleate** is a skin irritant and eye irritant, causing skin damage

14   in less than four hours and serious irritation to the cornea, iris, conjunctiva. Its

15   sensitization potential has not been assessed by any reputable authority. However,

16   based on its chemical structure and similarity to other known skin sensitizers, it is a

17   suspected skin sensitizer.

18       94.    **Lauryl glucoside** is a skin irritant and a suspected skin sensitizer, based

19   on its chemical structure and similarity to other known skin sensitizers.  Some tests

20   also classify it as a Category 1 skin sensitizer, meaning that repeated skin contact

21   causes a skin allergy in a substantial number of persons.  In these sensitized

22   individuals, very low future exposure can cause itching and a skin

23   rash.  Furthermore, it causes Category 1 eye damage, *i.e.*, it causes serious damage

24   to the eye tissue or serious physical decay of vision which is not fully reversible

25   within 21 days of application.

26       95.    **Lavandula angustifolia (lavender) oil** is classified as a Category 1 skin

27   sensitizer, based on positive testing demonstrating that repeated skin contact can be

28   expected to cause an allergic response in a substantial number of persons.  It causes

Category 1 eye damage, *i.e.*, it causes serious damage to the eye tissue or serious physical decay of vision which is not fully reversible within 21 days of application. It is also classified as a skin irritant, causing skin damage in less than four hours.

96.   ***PEG-40 hydrogenated castor oil*** has produced adverse reactions in human tests; a minute amount (0.05%) of PEG-40 hydrogenated castor oil caused skin reactions in 4% of human test subjects. In another test, small concentrations (0.1%) of PEG-40 hydrogenated castor oil in a leg cream caused strong eczema reactions.

97.   ***Polyquaternium-7*** is also a skin sensitizer. In human testing, concentrations of 8% polyquaternium-7 has caused sensitization in 5% of test subjects.

98.   ***Potassium cetyl phosphate*** is a skin irritant, causing skin damage in less than four hours.  It also causes serious eye damage lasting 21 days or longer.  It is suspected to be toxic to reproduction.

99.   The sensitization characteristics of ***styrene/acrylates copolymer*** have not been assessed by any reputable authority.

100.   The sensitization characteristics of ***polyglyceryl-2 dipolyhydroxystearate*** have not been assessed by any reputable authority.

101.   ***Coco-glucoside*** is a skin irritant, causing skin damage in less than four hours, and a Category 1 eye damage, *i.e.*, it causes serious damage to the eye tissue or serious physical decay of vision which is not fully reversible within 21 days of application.

102.   The sensitization potential of ***Red 40*** has not been assessed by any reputable authority. However, based on its chemical structure and similarity to other known skin sensitizers, it is a likely skin sensitizer. The limited testing performed on this ingredient demonstrates that it is a skin irritant and eye irritant.

103.   The sensitization characteristics of ***glyceryl polyacrylate*** have not been assessed by any reputable authority.

104.   **Zinc oxide** is a skin and eye irritant, a reproductive toxin that is known to damage fertility or the unborn child based on human evidence, a carcinogen that is known to induce cancer or increase its incidence in humans, based on human evidence, a suspected germ cell mutagen, *i.e.*, it is suspected of mutating human cells in a way that can be transmitted to children conceived after exposure. It is also very toxic to aquatic life with long lasting effects.  Some testing indicates that it is a Category 1 skin sensitizer, based on positive animal and/or human testing demonstrating that repeated skin contact can be expected to cause an allergic response in a substantial number of persons, and that it causes Category 1B skin corrosion, meaning that it irreversibly damages the skin after short exposure; in animal tests, the substance caused visible necrosis after less than 1 hour of exposure. Corrosive reactions are typified by ulcers, bleeding, bloody scabs, and, by the end of observation at 14 days, by discoloration due to blanching of the skin, complete areas of alopecia, and scars, and Category 1 eye damage, *i.e.*, it causes serious damage to the eye tissue or serious physical decay of vision which is not fully reversible within 21 days of application.

105.   **Zea mays (corn) starch** is a mild skin irritant.

106.   **Yellow 6** has produced allergenic responses in humans. It is also a skin and eye irritant.

107.   **Yellow 10** is a skin sensitizer, based on positive animal and human testing, demonstrating that repeated skin contact can be expected to cause allergic response in a substantial number of persons. It is also a skin and eye irritant.

108.   Though **xanthan gum** is safe as a food ingredient, it is an irritant to both the skin and eyes.  It is a Category 2 eye irritant, causing adverse effects on the cornea, iris, conjunctiva. It is also a Category 2 skin irritant, meaning that it causes significant erythema/eschar (redness and dead tissue) or edema (abnormal accumulation of fluid beneath the skin) lasting more than three days, or skin inflammation lasting longer than 14 days. Some testing indicates that it is also a skin

1  sensitizer.

2  109.   The sensitization potential of *trisiloxane* has not been assessed by any

3  reputable authority. The limited testing done, however, indicates that it is a suspected

4  skin sensitizer and may be an eye irritant. It is also environmentally persistent,

5  bioaccumulative, and inherently toxic to aquatic organisms.

6  110.   *Tricalcium phosphate* has not been assessed for its skin sensitization

7  potential.  It is, however, a known skin and eye irritant.

8  111.   The sensitization potential of *tetrasodium EDTA* has not been assessed

9  by any reputable authority. However, based on its chemical structure and similarity

10  to other known skin sensitizers, it is classified as a likely skin sensitizer. Some

11  testing classifies tetrasodium EDTA as a Category 1 skin sensitizer, based on

12  positive animal and/or human testing demonstrating that repeated skin contact can

13  be expected to cause an allergic response in a substantial number of persons. It

14  causes Category 1 eye damage, *i.e.*, it causes serious damage to the eye tissue or

15  serious physical decay of vision which is not fully reversible within 21 days of

16  application. It is an aliphatic amine, which is known to be environmentally toxic.

17  112.   *Talc* is an eye and skin irritant, and a possible human carcinogen.

18  113.   *Stearic acid* is classified as a skin and eye irritant.  It causes Category

19  1B skin corrosion, meaning that it irreversibly damages the skin after short exposure;

20  in animal tests, the substance caused visible necrosis after less than 1 hour of

21  exposure. Corrosive reactions are typified by ulcers, bleeding, bloody scabs, and, by

22  the end of observation at 14 days, by discoloration due to blanching of the skin,

23  complete areas of alopecia, and scars.  It is also a skin sensitizer, based on positive

24  human testing, demonstrating that repeated skin contact can be expected to cause

25  erythema in a substantial number of persons.  According to the National Institute for

26  Occupational Safety and Health, the health effects of exposure to stearic acid have

27  not been adequately investigated.  Nonetheless, animal testing has found it to be

28  acutely toxic and a possible carcinogen. Testing also indicates that it causes skin

corrosion, irreversibly damaging the skin after short exposure; in animal tests, the substance caused visible necrosis after less than 1 hour of exposure. It is also inherently toxic to aquatic animals.  Nonetheless, stearic acid makes up 1-5% of some of J&J's "hypoallergenic" products. Exhibit D.

114.   ***Stearyl alcohol*** is a skin sensitizer, based on human evidence, and a known skin and eye irritant.

115.   Based on human evidence, ***sorbitan laurate*** has caused contact dermatitis at concentrations as low as 2%. It is also a known skin and eye irritant.

116.   ***Sodium trideceth sulfate*** has not been adequately tested for safety.  However, based on its chemical structure and similarity to other known skin sensitizers, sodium tricedeth sulfate is classified as a likely skin sensitizer.  The little testing was done on the substance indicates that it causes serious eye damage lasting 21 days or longer.  It is also a skin irritant, causing skin damage in less than four hours. It is also harmful to aquatic life with long lasting effects. Nonetheless, sodium trideceth sulfate makes up 1-5% of some of J&J's "hypoallergenic" products. Exhibit D.

117.   The toxicological properties of ***sodium lauroamphoacetate*** have not been adequately examined. However, based on its chemical structure and similarity to other known skin sensitizers, it is a suspected skin sensitizer. Existing data indicates that the substance is hazardous by definition, may cause burns and/or dermatitis through repeated skin contact, and may cause irreversible damage through repeated eye contact.  Based on its molecular structure, the chemical may be an aliphatic amine, which is known to be environmentally toxic, an anionic surfactant, which known to be toxic to a wide variety of aquatic organisms, and/or a cationic (quaternary ammonium) surfactant, which is known to be biocidal to a wide array of species.

118.   ***Sodium laureth sulfate*** is classified as a Category 1 skin sensitizer, based on positive animal and/or human testing, demonstrating that repeated skin

contact can be expected to cause an allergic response in a substantial number of persons.  It causes Category 1 eye damage, *i.e.*, it causes serious damage to the eye tissue or serious physical decay of vision which is not fully reversible within 21 days of application. Sodium laureth sulfate is also harmful to aquatic life and toxic by definition under federal law, based on animal testing demonstrating that the substance is lethal even in very small doses.

119.   Repeated skin contact with ***sodium hydroxide*** is known to cause dermatitis. It also causes serious skin corrosion, irreversibly damaging the skin.  Concentrations as low as 5% cause Category 1A skin corrosion, meaning that it irreversibly damages the skin after short exposure; in animal tests, the substance caused visible necrosis after less than 3 minutes of exposure. Corrosive reactions are typified by ulcers, bleeding, bloody scabs, and, by the end of observation at 14 days, by discoloration due to blanching of the skin, complete areas of alopecia, and scars. Even minute amounts (0.5%) are irritating to the skin and eyes. It causes Category 1 eye damage, *i.e.*, it causes serious damage to the eye tissue or serious physical decay of vision which is not fully reversible within 21 days of application. It is also a suspected skin or sense organ toxicant.  Sodium hydroxide is regulated by numerous federal laws as a toxic and hazardous substance.  It is also federally regulated as a hazardous substance which, when discharged to navigable waters or adjoining shorelines (as by, e.g., washing J&J's product off the body), present an imminent and substantial danger to the public health or welfare.

120.   The sensitization potential of ***sodium citrate*** has not been assessed by any reputable authority. Based on its chemical structure and similarity to other known skin sensitizers, it is classified as a suspected skin sensitizer.  It is also classified as a skin and eye irritant.

121.   ***Sodium benzoate*** is a known skin sensitizer, based on positive animal and human testing, demonstrating that repeated skin contact has a high frequency of causing an allergic response in a substantial number of persons. It is also a skin

irritant and causes serious eye damage. Additionally, it is toxic to the female reproductive system, and it is suspected to be toxic to the male reproductive system.  It is also a suspected mutagen, meaning that it is suspected of producing inheritable mutations in human germ cells in a way that can be transmitted to children conceived after exposure. It may cause birth defects, and may also be toxic to blood, the liver, and the central nervous system. It is hazardous by definition under federal law, and is acutely toxic based on animal testing.  Its use is limited in Europe.

122.  **Red 33** is a known skin irritant.  Like most of J&J's ingredients, it has not been assessed for skin sensitization.

123.  **Quaternium-15** is a skin and eye irritant, a relatively common cause of allergic contact dermatitis in consumers, and is classified as a Category 1 skin sensitizer, as animal and/or human studies demonstrate that repeated skin contact causes allergic contact dermatitis in a substantial number of persons.  In these sensitized individuals, very low future exposure can cause itching and a skin rash.  It is recognized as an allergen by the American Contact Dermatitis Society. It is also a respiratory sensitizer.  It contains methylene chloride (which is known to cause cancer in animal studies) and releases formaldehyde (a suspected carcinogen). It is very toxic to aquatic life and environmentally persistent (*i.e.*, not biodegradable).  It is toxic by definition under federal law, based on animal testing demonstrating that the substance is lethal even in very small doses.

124.  Some studies classify **propylparaben** as a Category 1 skin sensitizer, based on positive animal and/or human testing demonstrating that repeated skin contact can be expected to cause an allergic response in a substantial number of persons. It causes Category 1 eye damage, *i.e.*, it causes serious damage to the eye tissue or serious physical decay of vision which is not fully reversible within 21 days of application.  It is also a suspected skin or sense organ toxicant.

125.  Because J&J failed to specify the chemical used, the safety of **potassium acrylates copolymer** cannot be determined.  Discovery is therefore

necessary.

126. ***PEG-80 sorbitan laurate***, a.k.a. ***polysorbate 20***, is classified as a Category 1 skin sensitizer, based on multiple positive tests demonstrating that repeated skin contact can be expected to cause allergic response in a substantial number of persons.   It is also a Category 2 skin and eye irritant, causing skin damage in less than four hours and adverse effects on the cornea, iris, and conjunctiva. Nonetheless, PEG-80 sorbitan laurate is in a substantial number of J&J products.  In many, it is second to only water in volume.

127. ***Polyquaternium-10*** is a skin and eye irritant.  Its sensitivity potential has not been assessed.

128. ***Phenoxyethanol*** is a skin and severe eye irritant. It has induced an allergic response in both human and animal testing. It is recognized as an allergen by the American Contact Dermatitis Society. It is toxic by all routes (inhalation, ingestion, and dermal contact). It is extremely hazardous in case of eye contact and very hazardous in case of skin contact (defatting the skin and causing skin inflammation characterized by itching, scaling, reddening, or, occasionally, blistering). Even short exposure can cause serious temporary or residual injury. It is toxic to the kidneys, the nervous system, and the liver, adversely affecting the central nervous system and peripheral nervous system, causing headaches, tremors, and central nervous system depression. It degrades into substances that are even more toxic.  It is a germ cell mutagen, suspected of mutating human cells in a way that can be transmitted to children conceived after exposure.  It is also a reproductive toxin, suspected of damaging fertility or the unborn child based on human or animal evidence. Phenoxyethanol is an ethylene glycol ether, which is known to cause wasting of the testicles, reproductive changes, infertility, and changes to kidney function. Phenoxyethanol is also carcinogen, meaning that it is suspected to induce cancer or increase its incidence. Case studies indicate that repeated exposure to phenoxyethanol results in acute neurotoxic effects, as well as chronic solvent-

induced brain syndrome, constant irritability, impaired memory, depression, alcohol intolerance, episodes of tachycardia and dyspnea, and problems with balance and rash.  Phenoxyethanol is also toxic by definition under federal law, and is regulated as a toxic compound.  Its use is restricted in Europe.

129.   *Petrolatum* is an eye irritant, causing adverse effects on the cornea, iris, conjunctiva, reversible in 7 days. Repeated exposure to petrolatum has caused dermatitis in some human subjects. It is also a presumed human carcinogen based on demonstrated animal carcinogenicity.  It is a reproductive toxin, suspected of damaging fertility or the unborn child based on human or animal evidence of skin contact.  It is also environmentally persistent.  Nonetheless, petrolatum makes up 1-5% of some J&J products. Exhibit D.

130.   Low molecular weight polyethylene glycol compounds, like J&J's *PEG-150 distearate*, are known to cause contact urticaria.  PEG-150 distearate is also a skin and eye irritant.

131.   *P-anisic acid* is a skin and strong eye irritant. Its sensitization potential has not been assessed.

132.   *Oleic acid* is a known skin and eye irritant. The sensitization potential of oleic acid has not been assessed by any reputable authority. However, based on its chemical structure and similarity to other known skin sensitizers, it is classified as a likely skin sensitizer. It is also inherently toxic to aquatic life. Additionally, according to a supplier, in humans, it passes the placental barrier and has been detected in maternal milk. Animal data suggests that it may cause cancer.  It may also affect genetic material (mutagenic).

133.   *Mineral oil* is a skin irritant, causing skin damage in less than four hours, and an eye irritant, causing adverse effects on the cornea, iris, conjunctiva lasting 7-21 days. Some testing indicates that it is also a skin sensitizer, based on positive animal tests demonstrating that repeated skin contact can be expected to cause allergic response in a substantial number of persons. It is a suspected germ cell

mutagen, meaning that it is suspected of mutating human cells in a way that can be transmitted to children conceived after exposure. It is a arget organ systemic toxin in humans, as generally low dermal exposure causes damage to the skin.   Nonetheless, J&J adds mineral oil to its products, at concentrations ranging from 1-5% to 10-20%. Exhibit D.

134.   **Methylparaben**'s use in cosmetics and topical products has caused allergic contact dermatitis. It is classified as a Category 1 skin sensitizer, based on positive animal and/or human testing demonstrating that repeated skin contact can be expected to cause an allergic response in a substantial number of persons. It is also a skin and eye irritant.

135.   The sensitization potential of **magnesium aluminum silicate** has not been assessed by any reputable authority.

136.   **Lauryl methyl gluceth-10 hydroxypropyldimonium chloride** is a proprietary chemical that has not been adequately tested for safety or skin sensitization potential. Nonetheless, the ingredient manufacturer has admitted that it is a moderate to strong eye irritant.

137.   **Laureth-4** has caused allergic skin reactions in humans.  It is also classified as a suspected skin sensitizer, based on its chemical structure and similarity to other known skin sensitizers that produce erythema in animal tests. Laureth-4 causes Category 1A skin corrosion, meaning that it irreversibly damages the skin after short exposure; in animal tests, the substance caused visible necrosis after less than 3 minutes of exposure. Corrosive reactions are typified by ulcers, bleeding, bloody scabs, and, by the end of observation at 14 days, by discoloration due to blanching of the skin, complete areas of alopecia, and scars. It causes Category 1 eye damage, *i.e.*, it causes serious damage to the eye tissue or serious physical decay of vision which is not fully reversible within 21 days of application. It is a suspected target organ systemic toxin, and it is highly toxic to aquatic life with long lasting effects. It is an ethylene glycol ether, which is known

to be toxic to the environment and to human health, e.g., it is known to cause wasting of the testicles, reproductive changes, infertility, and changes to kidney function.

138.   ***Isopropyl palmitate*** is a skin and eye irritant.  Moreover, it is an ester, a class of chemicals known to be environmentally toxic

139.   According to the manufacturer, there is no data regarding ***hydroxyethyl behenamidopropyl dimonium chloride***'s sensitization profile or dermal toxicity.  However, it is composed of behentrimonium methosulfate (which is very toxic to aquatic life, is toxic to aquatic life with long lasting effects, causes serious eye damage lasting 21 days or longer, causes skin damage in less than four hours, and may cause damage to organs through prolonged or repeated exposure) and cetearyl alcohol (a skin and eye irritant, causing skin damage in less than four hours and causing adverse effects on the cornea, iris, and conjunctiva).

140.   According to trade associations, concentrations as little as 0.05% of ***glycol distearate*** caused slight to severe skin irritation.

141.   ***Glyceryl stearate*** is a skin and eye irritant. It is also inherently toxic to aquatic life.

142.   ***Glycerin*** is classified as a skin and eye irritant. It is also known to cause eczema in humans. Based on its chemical structure and similarity to other known skin sensitizers, it is a suspected skin sensitizer. Nonetheless, J&J adds glycerin to its products at concentrations of 5-10%. Exhibit D.

143.   J&J does not disclose the identity of the fragrances it uses, listing only the generic ***fragrance***, or ***parfum*** on its product label.  Many synthetic fragrances are known to be human sensitizers, toxins and environmental hazards, and are associated with adverse reproductive effects, genetic mutations, and other ill effects.

144.   ***Ethylparaben*** is classified as a Category 1 skin sensitizer, based on positive animal and/or human testing demonstrating that repeated skin contact can be expected to cause an allergic response in a substantial number of persons. It is also a Category 2 eye irritant, causing adverse effects on the cornea, iris, conjunctiva,

and a Category 2 skin irritant, meaning that it causes significant erythema/eschar (redness and dead tissue) or edema (abnormal accumulation of fluid beneath the skin) lasting more than three days, or skin inflammation lasting longer than 14 days. It is linked to reproductive-specific developmental abnormalities.

145.   ***Ethylhexylglycerin*** causes Category 1 eye damage, *i.e.*, it causes serious damage to the eye tissue or serious physical decay of vision which is not fully reversible within 21 days of application. It is also toxic to aquatic organisms, with long-term adverse effects.

146.   The sensitization potential of ***disodium lauroamphodiacetate*** has not been assessed by any reputable authority. Based on its chemical structure and similarity to other known skin sensitizers, disodium lauroamphodiacetate is classified as a likely skin sensitizer. Moreover, based on its structure, this chemical maybe an anionic surfactant and/or cationic surfactant, both known to be toxic to a variety of aquatic organisms.

147.   The sensitization potential of ***dimethicone*** has not been assessed by any reputable authority. However, based on its chemical structure and similarity to other known skin sensitizers, it is classified as a likely skin sensitizer. The limited testing of dimethicone demonstrates that it causes Category 1A skin corrosion, meaning that it irreversibly damages the skin after short exposure; in animal tests, the substance caused visible necrosis after less than 3 minutes of exposure. Corrosive reactions are typified by ulcers, bleeding, bloody scabs, and, by the end of observation at 14 days, by discoloration due to blanching of the skin, complete areas of alopecia, and scars. It causes Category 1 eye damage, *i.e.*, it causes serious damage to the eye tissue or serious physical decay of vision which is not fully reversible within 21 days of application. Dimethicone is presumed to cause damage to organs after generally moderate exposure, and it is suspected of damaging fertility or the unborn child based on human or animal evidence. It is inherently toxic to aquatic life, hazardous to the environment, and environmentally persistent (*i.e.*, not biodegradable). It is

considered to impair fertility in rats by inhalation, and is a potential carcinogen (uterine tumors).

148. **Cocamidopropyl betaine** is a known skin sensitizer, based on positive animal and/or human testing demonstrating that repeated skin contact can be expected to cause allergic response in a substantial number of persons. In fact, cocamidopropyl betaine was named the Allergen of the Year in 2004 by the American Contact Dermatitis Society. Cocamidopropyl betaine is also a skin irritant and causes Category 1 eye damage, *i.e.*, it causes serious damage to the eye tissue or serious physical decay of vision which is not fully reversible within 21 days of application. Based on human or animal evidence, it is suspected of damaging fertility or the unborn child. It is also very toxic to aquatic life. Nonetheless, J&J includes cocamidopropyl betaine in a significant number of its products -- in many products, it is second only to water in terms of volume. It is in J&J products at 1-5% concentrations, Exhibit D, an amount that is known to cause skin sensitization.

149. While **citric acid** is a common food ingredient, skin contact is known to cause allergic reactions in humans. It has been reported to cause Category 1B skin corrosion, meaning that it irreversibly damages the skin after short exposure; in animal tests, the substance caused visible necrosis after less than 1 hour of exposure. Corrosive reactions are typified by ulcers, bleeding, bloody scabs, and, by the end of observation at 14 days, by discoloration due to blanching of the skin, complete areas of alopecia, and scars. It causes Category 1 eye damage, *i.e.*, it causes serious damage to the eye tissue or serious physical decay of vision which is not fully reversible within 21 days of application. It is classified as a skin and eye irritant.

150. **Cetyl alcohol** has caused urticaria-like dermatitis in humans. It is also a skin and eye irritant, and it is inherently toxic to aquatic life with long-lasting effects. Nonetheless, J&J adds cetyl alcohol to its products, at concentrations of 1-5%. Exhibit D.

151. The sensitization potential of **ceteth-10** has not been assessed by any

reputable authority. However, based on its chemical structure and similarity to other known skin sensitizers, it is a suspected skin sensitizer. Moreover, Ceteth-10 also has not been sufficiently analyzed for safety. What little data exists shows it to be harmful to the skin; concentrations as low as 1% led to erythema and edema, and concentrations over 10% led to thickening of the skin. It is a Category 2 skin irritant, causing skin damage in less than four hours, and causes Category 1 eye damage -- serious eye damage lasting 21 days or longer. It is toxic by definition under federal law and very toxic to the aquatic environment.

152.   ***Cetearyl glucoside*** has not been adequately studied for safety in personal care products. However, based on its chemical structure and similarity to other known skin sensitizers, cetearyl glucoside is classified as a likely skin sensitizer.   The limited testing done on cetearyl glucoside demonstrates that it causes Category 1 serious eye damage lasting 21 days or longer and is a Category 2 skin irritant, causing skin damage in less than four hours. It is also very toxic to aquatic life.

153.   ***Cetearyl alcohol***'s safety for use in bodycare products has not been adequately assessed.   The limited testing done, however, shows it to be a skin irritant and eye irritant, causing skin damage in less than four hours and adverse effects on the cornea, iris, conjunctiva. It is inherently toxic to aquatic life, It is also toxic to the mucous membranes, and is hazardous by definition under federal law.

154.   The sensitization properties of ***ceteareth-12*** and ***ceteareth-20*** have not been thoroughly investigated.   The limited testing done, however, indicates that it is a skin irritant and corrosive to ocular tissue, causing serious eye damage lasting 21 days or longer.   Ceteareth-12 and -20 are also very toxic to the aquatic environment and toxic by definition under federal law, based on animal testing demonstrating that the substance is lethal even in very small doses.

155.   The sensitization properties of ***ceteareth-6*** have not been thoroughly investigated.   The limited testing done, however, indicates that it is a skin irritant

and corrosive to ocular tissue, causing serious eye damage lasting 21 days or longer. Ceteareth-6 is also very toxic to the aquatic environment and toxic by definition under federal law, based on animal testing demonstrating that the substance is lethal even in very small doses.

156. J&J adds "**_carbomer_**" to its products, but does not specify what substance it is adding. "Carbomer" could refer to Carbomer 934, which is a weak sensitizer that irreversibly damages the skin after short exposure; in animal tests, the substance caused visible necrosis after less than 3 minutes of exposure. Corrosive reactions are typified by ulcers, bleeding, bloody scabs, and, by the end of observation at 14 days, by discoloration due to blanching of the skin, complete areas of alopecia, and scars. Some studies indicate that Carbomer 934 is a germ cell mutagen known or presumed to mutate human cells in a way that can be transmitted to children conceived after exposure. Some studies indicate that it is also a carcinogen. Or "Carbomer" could refer to carboxypolymethylene, Carbomer 940, or Carbomer 941, all of which lack sufficient safety testing. All carbomers contain 0.1-0.5% benzene, a known human carcinogen that causes acute central nervous system damage and chronic bone marrow damage.

157. **_Benzyl alcohol_** is classified as a Category 1 skin sensitizer, based on positive animal and/or human testing demonstrating that repeated skin contact can be expected to cause an allergic response in a substantial number of persons. It is known to cause allergic reactions in 1.2 to 15% of patients with eczema from cosmetic products. It is also known to induce nonimmunologic contact reactions without any previous sensitization. It is also a skin and eye irritant, causing serious eye damage lasting 21 days or longer. It is recognized as an allergen by the American Contact Dermatitis Society. It may also be a teratogen, causing birth defects. Animal studies have shown it causes lung, liver, kidney, and central nervous system disorders. It is a suspected immunotoxicant, suspected neurotoxicant, and suspected skin or sense organ toxicant. It is toxic to aquatic organisms, toxic by definition

under federal law, and its use is restricted in Europe.

158. ***Benzalkonium chloride*** is classified as a Category 1 skin sensitizer, based on positive animal and/or human testing demonstrating that repeated skin contact can be expected to cause an allergic response in a substantial number of persons. It causes Category 1B skin corrosion, meaning that it irreversibly damages the skin after short exposure; in animal tests, the substance caused visible necrosis after less than 1 hour of exposure. Corrosive reactions are typified by ulcers, bleeding, bloody scabs, and, by the end of observation at 14 days, by discoloration due to blanching of the skin, complete areas of alopecia, and scars. It causes Category 1 eye damage, *i.e.*, it causes serious damage to the eye tissue or serious physical decay of vision which is not fully reversible within 21 days of application. It is recognized as an allergen by the American Contact Dermatitis Society. Additionally, benzalkonium chloride is a Category 2 reproductive toxin, meaning that it is suspected of damaging fertility or the unborn child based on human or animal evidence.  Its use is restricted in Europe.

159. ***Behentrimonium methosulfate*** has not been studied for skin sensitizing potential.  However, it is closely related to behentrimonium chloride, which is a sensitizer. Behentrimonium methosulfate is known to cause serious eye damage lasting 21 days or longer. It is a skin irritant, causing skin damage in less than four hours. It is also very toxic to aquatic life.

160. ***Caprylyl glycol*** causes Category 1 eye damage, *i.e.*, it causes serious damage to the eye tissue or serious physical decay of vision which is not fully reversible within 21 days of application.

161. The sensitization potential of ***PEG-100 stearate*** has not been assessed by any reputable authority. Based on its chemical structure and similarity to other known skin sensitizers, it is classified as a suspected skin sensitizer.  It is also classified as a skin and eye irritant.

162. ***Steareth-20*** causes Category 1 eye damage, *i.e.*, it causes serious

damage to the eye tissue or serious physical decay of vision which is not fully reversible within 21 days of application.

163.   The sensitization potential of *sorbitol* has not been assessed by any reputable authority. However, based on its chemical structure and similarity to other known skin sensitizers, it is a suspected skin sensitizer.

164.   *Violet 2* is classified as a Category 1 skin sensitizer, based on positive animal and/or human testing, demonstrating that repeated skin contact can be expected to cause an allergic response in a substantial number of persons.

165.   According to ingredient manufacturers, *Orange 4* is a skin and strong eye irritant that may cause allergic reactions in sensitive individuals.

166.   Several tests classify *avena sativa (oat) kernel flour* as a Category 1 skin sensitizer, based on positive animal and/or human testing, demonstrating that repeated skin contact can be expected to cause an allergic response in a substantial number of persons.

167.   *Propylene glycol* is a skin irritant, eye irritant, and a Category 1 skin sensitizer, meaning that repeated skin contact causes a skin allergy in a substantial number of persons.  In these sensitized individuals, very low future exposure can cause itching and a skin rash.  Moreover, animal test data indicate that propylene glycol may cause adverse reproductive effects and birth defects.  It is also very toxic to aquatic life. It is recognized as an allergen by the American Contact Dermatitis Society.  Though not disclosed on ingredient labels, J&J's popular pink lotion contains 1-5% of propylene glycol.  Exhibit D.

## THE REPRESENTATIONS ARE
## FALSE, DECEPTIVE, AND MISLEADING

168.   J&J's conduct deceived and/or was likely to deceive the public. Consumers were deceived into believing that the Falsely Labeled Products were hypoallergenic, as labeled.

169.   All these representations were false, as explained *supra*.

170.   Consumers would not know the true nature of the ingredients merely by reading the ingredient label.  Its discovery requires investigation beyond the grocery store and knowledge of chemistry beyond that of the average reasonable consumer.

## LOCATION OF THE MISREPRESENTATIONS

171.   J&J made the above false, deceptive, and misleading misrepresentations and omissions on the package of the Falsely Labeled Products. *See* Exhibit B.

172.   J&J repeated the above false, deceptive, and misleading misrepresentations and omissions on its online retail product page for the Falsely Labeled Products. *See* Exhibit C.

173.   The misrepresentations and omissions were uniform and have actually been communicated to Plaintiff and to each member of the Class at every point of purchase and consumption.

## J&J'S DECEPTIVE AND MISLEADING OMISSIONS

174.   J&J presents itself as an expert in baby skincare.  J&J boasts:

> That's why we have published more research in this area than any other global skin care company over the last five years. Our research is being used to set the standards in baby care around the world. As a global healthcare company focused on skin health, we have strived to fill critical research gaps by helping to advance 90% of publications and peer-reviewed scientific literature on the understanding of baby skin.

Exhibit R.

175.   In 2011, in a letter to its customers outlining its "Safety and Care Commitment," J&J explained:

> We understand that earning your trust means more than meeting government safety regulations, and sometimes even more than meeting the highest scientific standards for safety. Trust means gaining your complete confidence in our ingredient selection and decision-making process as a company, and also making your views and concerns a part of this process. That's why we've created a website that brings to life

1   all we do to ensure the quality and safety of every product: <u>Our Safety
    & Care Commitment</u>.

2   Exhibit S.

3       176.   J&J deceptively and misleadingly conceals other material facts about

4   the Falsely Labeled Products, including:

5           a.      the true nature of the Falsely Labeled Products' ingredients;

6           b.      the identity of the Falsely Labeled Products' ingredients;

7           c.      that the Falsely Labeled Products contain sensitizers, irritants,

8   toxins, carcinogens, pollutants, and/or otherwise hazardous substances;

9           d.      the concentration of the sensitizers, irritants, toxins, carcinogens,

10  pollutants, and/or otherwise hazardous substances in the Falsely Labeled Products;

11          e.      that the Falsely Labeled Products are not "hypoallergenic";

12          f.      that the Falsely Labeled Products are not what a reasonable

13  consumer would consider to be "hypoallergenic;"

14          g.      that the Falsely Labeled Products contain chemicals that a

15  reasonable consumer would not expect in a product labeled as "hypoallergenic."

16      177.   Plaintiffs and the members of the Class are not at fault for failing to

17  discover J&J's wrongs earlier, and had no actual or presumptive knowledge of facts

18  sufficient to put them on inquiry notice.

19      178.   J&J has concealed the identity of several ingredients. Discovery is

20  therefore necessary to determine their identity.  These ingredients may also be

21  sensitizers, irritants, or otherwise toxic.

22      179.   For example, J&J adds "***fragrance***" or "***parfum***" to its products, but

23  does not identify what chemical is used. Many ingredients used as fragrances are

24  known skin sensitizers.  Many are also extremely toxic to a person's skin, their

25  overall health, and/or to the environment.

26      180.   As another example, J&J adds "***carbomer***" to its products, but does not

27  specify what substance it is adding.  "Carbomer" could refer to Carbomer 934, which

28  irreversibly damages the skin after short exposure; in animal tests, the substance

caused visible necrosis after less than 3 minutes of exposure. Some studies indicate that it is a germ cell mutagen known or presumed to mutate human cells in a way that can be transmitted to children conceived after exposure. Some studies indicate that it is also a carcinogen. Or "Carbomer" could refer to carboxypolymethylene, Carbomer 940, Carbomer 941, or another carbomer, for which there is insufficient safety testing.

181.   Similarly, because J&J failed to specify the chemical used, the safety of *potassium acrylates copolymer* cannot be determined absent discovery.

182.   Furthermore, J&J has not disclosed the concentration of each ingredient in its products. Further investigation and discovery is needed so that Plaintiff can ascertain whether entire products are also toxic.

183.   J&J has also concealed from consumers the nature of its products' ingredients despite consumers' requests. The possible carcinogenic, toxic, and environmental effects of its ingredients are still concealed from consumers today.

184.   These facts are not ascertainable and are still not known to Plaintiff, the Class members, and reasonable consumers. J&J's concealment tolls the applicable statute of limitations.

185.   To this day, J&J continues to conceal and suppress the existence, true identity, nature, and concentration of the sensitizers, irritants, toxins, carcinogens, pollutants, and/or otherwise hazardous substances in the Falsely Labeled Products.

186.   Similarly, to this day, J&J continues to conceal and suppress the fact that the Falsely Labeled Products are not "hypoallergenic" as promised.

187.   J&J represents elsewhere on the product label and on its website that the products are "safe," "gentle," "mild," cause "no more tears," etc. This further obscures the fact that J&J's products are not hypoallergenic.

188.   For example, in its Safety and Care Commitment, J&J also promises that its ingredients are "not only gentle on baby, but also gentle on the environment long after you use them." As J&J knows, consumers care about the environmental

effect of their bodycare products, "[s]ince many of our products are washed off the body into the local wastewater systems, which then feed into the broader water supply . . ." Exhibit T.  *See also* Exhibit U ("We believe that human health and environmental health are inextricably linked, and our sustainability goals are designed to advance the health and well-being of people around the world and our planet."); Exhibit V (Ingredient Policies) ("When dealing with human or environmental safety, there are no shortcuts and we do not compromise on safety for expediency in the process."); Exhibit W ("All ingredients are assessed for human and environmental safety.").

189.   Nonetheless, many ingredients in J&J's products are known to be toxic to aquatic life.  Some are even regulated under the Clean Water Act as a hazardous substances which, when discharged to navigable waters or adjoining shorelines, present an imminent and substantial danger to the public health or welfare.  *See* ¶¶ 89-167, *supra*.

## J&J KNEW ITS REPRESENTATIONS WERE FALSE

190.   J&J holds itself out to the public as trusted experts in the area of hypoallergenic, safe, mild, and gentle personal care products.

191.   J&J knew what representations it made regarding the Falsely Labeled Products, as all representations appear on the products' packages.

192.   J&J also knew what ingredients were added to each product, as (presumably) all product ingredients listed on the product packages and are further disseminated on their websites.

193.   J&J is governed by and thus is presumed to know the federal regulations and state laws that control the labeling of the Falsely Labeled Products, and thus is aware that many of the ingredients have been federally declared to be chemical compounds that require inventory reporting under the Toxic Substance Control Act, are hazardous or toxic compounds that require special disclosures on safety data sheets, or are carcinogens or reproductive toxins that require product

label warnings under state law.

194.  J&J thus knew all the facts demonstrating that its Falsely Labeled Products contain sensitizers, irritants, and otherwise toxic ingredients, and that these products were therefore falsely labeled.

## J&J INTENDED CONSUMERS RELY

195.  As J&J knows, consumers prefer hypoallergenic products. As J&J knows, consumers will pay a premium for hypoallergenic products or would not purchase these products at all unless they were hypoallergenic, as advertised.

196.  J&J encourages consumers' preference for hypoallergenic products – specifically for J&J's products – explaining to consumers that:

> Your baby's skin is different than adult skin. It may look perfect, but it is very delicate so it needs extra special care throughout the first years of life. Compared to adult's skin, baby's skin:
>
> - Is about 30% thinner
> - Can lose moisture faster
> - Is more prone to irritation
> - Absorbs water at a faster rate, and can lose it faster, too
>
> Because it is more delicate, baby's skin needs more protection from environmental changes and harsh cleansers. So when caring for your little one, use a mild and gentle cleanser and moisturizer that are developed especially for baby like JOHNSON'S® baby HEAD-TO-TOE® wash and JOHNSON'S® baby lotion.

Exhibit X.

197.  J&J's misleading affirmative statements (*e.g.*, that the products were mild, gentle, safe, caused "no more tears," or were environmentally safe) further obscured what J&J failed to disclose.  Thus, reliance upon J&J's misleading and deceptive representations and omissions may be presumed.

198.  J&J made the false, deceptive, and misleading representations and omissions, intending Plaintiff and Class members to rely upon these representations and omissions in purchasing and using one or more Falsely Labeled Products.

199.  In making the false, misleading, and deceptive representations and omissions at issue, J&J knew and intended that consumers would purchase the J&J

products when consumers would otherwise purchase a competing product or employ an alternate regimen (such as using an oil for moisturizing).

200.   In making the false, misleading, and deceptive representations and omissions at issue, J&J also knew and intended that consumers would pay a premium for hypoallergenic products, furthering J&J's private interest of increasing sales of its products and decreasing the sales of products marketed by its competitors.

## **CONSUMERS REASONABLY RELIED**

201.   Consumers frequently rely on ingredient representations and information in making purchase decisions, especially in purchasing personal care products.

202.   When Plaintiff and the Class members purchased the Falsely Labeled Products, Plaintiff and the Class members saw the false, misleading, and deceptive representations detailed above, and did not receive disclosure of the facts concealed, as detailed above.

203.   These misrepresentations were uniform and were communicated to Plaintiffs and every other member of the Class at every point of purchase and consumption.

204.   Plaintiffs and the Class members were among the intended recipients of J&J's deceptive representations and omissions.

205.   Plaintiffs and the Class members reasonably relied to their detriment on J&J's misleading representations and omissions.

206.   J&J's false, misleading, and deceptive misrepresentations and omissions deceived and misled, and are likely to continue to deceive and mislead, Plaintiffs, the Class members, reasonable consumers, and the general public.

207.   J&J's misleading affirmative statements further obscured what it failed to disclose.  Thus, reliance upon J&J's misleading and deceptive representations and omissions may be presumed.

208.   J&J made the deceptive representations and omissions with the intent

to induce Plaintiffs and the Class members to purchase the Falsely Labeled Products. Plaintiff's and the Class members' reliance upon such representations and omissions may be presumed.

209.   J&J's deceptive representations and omissions are material in that a reasonable person would attach importance to such information and would be induced to act upon such information in making purchase decisions.   Thus, Plaintiff's and the Class members' reliance upon such representations and omissions may be presumed as a matter of law.   The materiality of those representations and omissions also establishes causation between J&J's conduct and the injuries sustained by Plaintiff and the Class members.

## J&J'S WRONGFUL CONDUCT CAUSED PLAINTIFF'S INJURY

210.   As an immediate, direct, and proximate result of J&J's false, misleading, and deceptive representations and omissions, J&J injured Plaintiffs and the Class members in that they:

a.   paid a sum of money for a product that was not as represented;

b.   paid a premium price for a product that was not as represented;

c.   were deprived the benefit of the bargain because the Falsely Labeled Products they purchased were different from what J&J warranted;

d.   were deprived the benefit of the bargain because the Falsely Labeled Products they purchased had less value than what was represented;

e.   did not receive a product that measured up to their expectations as created by J&J;

f.   used (or caused their children to use) a substance that Plaintiffs and the members of the Class did not expect or consent to;

g.   used (or caused their children to use) a product that was not hypoallergenic;

h.   without their knowing consent, used (or caused their children to use) a substance that is generally harmful to their health or their children's health;

i.   without their knowing consent, used (or caused their children to use) a substance that is a skin sensitizer, irritant, or a known or suspected toxin, carcinogen, mutagen, teratogen, environmental pollutant, or otherwise is harmful to the environment and/or their health.

211.   Had J&J not made the false, misleading, and deceptive representations and omissions, Plaintiffs and the Class members would not have been injured as listed above. Accordingly, Plaintiffs and the Class members have suffered "injury in fact" as a result of J&J's wrongful conduct.

212.   Plaintiffs and the Class members all paid money for the Falsely Labeled Products, but did not obtain the full value of the advertised products due to J&J's misrepresentations and omissions.   Plaintiffs and the Class members purchased, purchased more of, or paid more for, the Falsely Labeled Products than they would have had they known the truth about the Falsely Labeled Products.   Accordingly, Plaintiffs and the Class members have suffered injury in fact and lost money or property as a result of J&J's wrongful conduct.

## J&J BENEFITTED FROM ITS MISLEADING AND DECEPTIVE REPRESENTATIONS AND OMISSIONS

213.   As the intended, direct, and proximate result of J&J's false, misleading, and deceptive representations and omissions, J&J has been unjustly enriched through more sales of Falsely Labeled Products and higher profits at the expense of Plaintiffs and the Class members.   As a direct and proximate result of its deception, J&J also unfairly obtained other benefits, including the higher value associated with a "hypoallergenic" brand and the resulting higher stock value, redirecting sales to it and away from its competitors, and increased sales of its other products.

## CLASS ALLEGATIONS

214.   Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and all other similarly situated United States residents who purchased the Falsely Labeled Products (as defined herein) (the

"Nationwide Class").

215.   Plaintiffs Rugg and Fish also bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and all other similarly situated California residents who purchased the Falsely Labeled Products (as defined herein) (the "California Class").

216.   Plaintiff Sanchez also brings this action on behalf of herself and all similarly situated New Jersey residents who purchased the False Labeled Products (as defined herein) (the "New Jersey Class").

217.   Excluded from the Nationwide Class, the California Class and the New Jersey Class ("Classes" or "Class") are officers and directors of J&J; members of the immediate families of the officers and directors of J&J; J&J's legal representatives, heirs, successors, or assigns; any entity in which they have or have had a controlling interest; and, any judge assigned to this case and his/her immediate family members.

218.   Plaintiffs bring claims for each Class pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(1), 23(b)(2), and 23(b)(3).

219.   At this time, Plaintiffs do not know the exact number of the Class members; given the nature of the claims and the number of sales that J&J has made of the Falsely Labeled Products, Plaintiffs believe that members of each Class are so numerous that joinder of all members is impracticable.

220.   There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class that predominate over questions that may affect individual Class members include:

   a.   whether J&J misrepresented and/or failed to disclose material facts concerning the Falsely Labeled Products;

   b.   whether J&J's conduct was unfair and/or deceptive; and

   c.   whether J&J breached an express warranty created through the

1   labeling and marketing of its Falsely Labeled Products.

2       221.   Plaintiffs' claims are typical of those of the Class because Plaintiffs,

3   like all members of the Class, purchased one or more of J&J's Falsely Labeled

4   Products at a premium price, relying on J&J's false and misleading representations,

5   and Plaintiffs sustained damages from J&J's wrongful conduct.

6       222.   Plaintiffs will fairly and adequately protect the interests of the Class

7   because Plaintiffs are similarly situated with, and have suffered similar injuries as,

8   the members of the Class he seeks to represent.  Plaintiffs feel that they have been

9   deceived, wish to obtain redress of the wrong, and want J&J to be stopped from

10  perpetrating similar wrongs on others.  Plaintiffs are adequate representatives of the

11  Class because their interests do not conflict with the interests of the Class members

12  they seek to represent, and they have retained counsel competent and experienced in

13  conducting complex class action litigation, who were the first to publicly uncover

14  the true scope and extent of J&J's wrongs.  Plaintiffs have no interests adverse to

15  those of the Class members, and will vigorously prosecute this litigation.

16      223.   A class action is superior to other available methods for the fair and

17  efficient adjudication of this controversy.  Specifically, no Class member has a

18  substantial interest in individually controlling the prosecution of a separate action.

19  The damages suffered by each individual Class member likely will be relatively

20  small, especially given the burden and expense of individual prosecution of the

21  complex litigation necessitated by J&J's conduct.   Thus, it would be virtually

22  impossible for the Class members individually to redress effectively the wrongs

23  done to them.

24      224.   The prerequisites to maintaining a class action for injunctive or

25  equitable relief are met as J&J has acted or refused to act on grounds generally

26  applicable to the Class, thereby making appropriate final injunctive or equitable

27  relief with respect to the Class as a whole.

28      225.   Upon information and belief, there are no pending lawsuits concerning

the products at issue in this case.  Concentration of the litigation concerning this matter in this Court is desirable, and the difficulties likely to be encountered in the management of a class action are not great.  The resolution of the claims of all Class members in a single forum, and in a single proceeding, would be a fair and efficient means of resolving the issues raised in this litigation.

226.   The prosecution of separate actions by Class would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for J&J.

227.   J&J's conduct is generally applicable to the Class as a whole and Plaintiff seeks, *inter alia*, equitable remedies with respect to the Class as a whole. As such, J&J's systematic policies and practices make declaratory relief with respect to the Class as a whole appropriate.

228.   The Class is specifically identifiable to facilitate provision of adequate notice and there will be no significant problems managing this case as a class action. Notice to the Class can be made through various means, such as in-store leaflets, website notices, Facebook notices, notices on the labels of the packages, and/or direct notice to those consumers for which J&J knows the e-mail or physical mailing address.

## <u>COUNT 1</u>

**Breach of Express Warranty**
***On Behalf of the Nationwide Class and, in the alternative,***
***<u>the California Class and the New Jersey Class</u>***

229.   Plaintiffs repeat and reallege all prior allegations as if set forth at length herein.

230.   J&J provided Plaintiffs and other members of the Class with written express warranties including, but not limited to, warranties that its Falsely Labeled Products were "hypoallergenic."

231.   These affirmations of fact or promises by J&J relate to the goods and became part of the basis of the bargain.

232.   Plaintiffs and members of each Class purchased the Falsely Labeled Products, believing them to conform to the express warranties.

233.   J&J breached these warranties.  This breach resulted in damages to Plaintiff and other members of the Class, who bought Falsely Labeled Products but did not receive the goods as warranted.

234.   As a proximate result of the breach of warranties by J&J, Plaintiffs and the other members of the Class did not receive goods as warranted.  Plaintiffs and the members of the Class therefore have been injured and have suffered damages in an amount to be proven at trial.  Among other things, Plaintiffs and members of the Class did not receive the benefit of the bargain and have suffered other injuries as detailed above.  Moreover, had Plaintiffs and the Class members known the true facts, they would not have purchased the products, would have purchased fewer products, or would not have been willing to pay the premium price J&J charged for the products.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## COUNT 2

### Unjust Enrichment
### *On Behalf of the Nationwide Class and, in the alternative,*
### *the California Class and the New Jersey Class*

235.   Plaintiffs repeat and reallege all prior allegations as if set forth at length herein.

236.   As a result of J&J's deceptive, fraudulent, and misleading labeling, advertising, marketing, and sales of the Falsely Labeled Products, J&J was enriched at the expense of Plaintiffs and the other members of the Class through the payment of the purchase price for J&J's Falsely Labeled Products.

237.   Under the circumstances, it would be against equity and good conscience to permit J&J to retain the ill-gotten benefits that it received from Plaintiff and the other members of the Class, in light of the fact that the Falsely

Labeled Products purchased by Plaintiffs and the other members of the Class were not what J&J purported them to be.  Thus, it would be unjust or inequitable for J&J to retain the benefit without restitution to Plaintiffs and the other members of the Class for the monies paid to J&J for such Falsely Labeled Products.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## COUNT 3

**Unfair and Deceptive Acts and Practices**
***On Behalf of the Nationwide Class and,***
***<u>in the alternative, the California Class</u>***

238.  Plaintiffs repeat and reallege all prior allegations as if set forth at length herein.

239.  Plaintiffs Rugg and Fish bring this cause of action pursuant to California's Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750-1785 (the "CLRA") and similar statutes.

240.  Plaintiffs Rugg and Fish and the other members of the Class are "consumers," as the term is defined by California Civil Code § 1761(d) and similar statutes, because they bought the Falsely Labeled Products for personal, family, or household purposes.  J&J is a "person" under Cal. Civ. Code § 1761(c) and similar statutes.

241.  The Falsely Labeled Products are "goods" under Cal. Civ. Code § 1761(a) and similar statutes.   Plaintiffs, the other members of the Class, and J&J have engaged in "transactions," as that term is defined by California Civil Code § 1761(e) and similar statutes. For the California Class, these transactions all occurred in the State of California.

242.  The conduct alleged in this Complaint constitutes unfair methods of competition and unfair and deceptive acts and practices for the purposes of the CLRA and similar statutes, and the conduct was undertaken by J&J in transactions intended to result in, and which did result in, the sale of goods to consumers.

243.   J&J's false and fraudulent representations and omissions have violated, and continue to violate the CLRA and similar statutes because they extend to transactions that are intended to result, or have resulted, in the sale of goods to consumers, including the Plaintiff and the Class members.

244.   J&J's conduct violates Cal. Civ. Code § 1770(a)(5) and similar statutes, which prohibits "[r]epresenting that goods . . . have . . . characteristics [or] ingredients . . . which they do not have," and Cal. Civ. Code § 1770(a)(7) and similar statutes, which prohibits: "[r]epresenting that goods . . . are of a particular standard, quality, or grade . . . if they are of another," causing injury to Plaintiffs and the Class.

245.   As a result of engaging in such conduct, J&J has violated California Civil Code § 1770(a)(5), (a)(7), and (a)(9) and similar statutes.

246.   Plaintiffs will serve J&J with notice of its CLRA violations by certified mail, return receipt requested.  If, after the requisite thirty days of receiving notice, J&J continues to refuse to correct its wrongs, Plaintiffs will amend this Complaint to include a claim for punitive damages for J&J's CLRA violations.

247.   Plaintiffs and the Class members seek preliminary injunctive relief, and permanent injunctive relief against J&J's unfair and deceptive acts and conduct.

248.   Pursuant to California Civil Code § 1780(a)(2) and (a)(5) and similar statutes, Plaintiffs seek an order of this Court that includes, but is not limited to, an order enjoining J&J from continuing to engage in unlawful, unfair, or fraudulent business practices or any other act prohibited by law.

249.   Plaintiffs and the other Class members may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

250.   The unfair and deceptive acts and practices of J&J, as described above, present a serious threat to Plaintiffs and the other members of the Class.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## COUNT 4

### Violations of California's False Advertising Law and Similar Statutes
### *On Behalf of the Nationwide Class and,*
### *in the alternative, the California Class*

251.   Plaintiffs repeat and reallege all prior allegations as if set forth at length herein.

252.   Plaintiffs Rugg and Fish bring this cause of action pursuant to California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500 *et seq.* and similar statutes.

253.   Such acts of J&J, as described above, and each of them constitute unlawful, deceptive, and fraudulent business acts and practices.

254.   At all material times, J&J engaged in a scheme of offering the Falsely Labeled Products for sale to Plaintiffs and the other members of the Class by way of distributing within the State of California (or their residence) to the public, *inter alia,* commercial marketing and advertising, the World Wide Web (Internet), Falsely Labeled Product packaging and labeling, and other promotional materials and offered for sale the Falsely Labeled Products on a nationwide basis, including in California.

255.   The misrepresentations and non-disclosures by J&J of the material facts detailed above constitute false and misleading advertising, and therefore constitute a violation of Cal. Bus. & Prof. Code § 17500, *et seq.* and similar statutes.

256.   Said advertisements and inducements were made within the state of residence and come within the definition of advertising contained in the FAL in that such promotional materials were intended as inducements to purchase J&J's Falsely Labeled Products and are statements disseminated by J&J to Plaintiffs and the other Class members.   J&J knew, or in the exercise of reasonable care should have known, that these representations were misleading and deceptive.

257.   Consumers, including Plaintiffs and the other Class members, necessarily and reasonably relied on these materials concerning J&J's Falsely

Labeled Products.  Consumers, including Plaintiffs and the Class members, were among the intended targets of such representations.

258.   The above acts of J&J did and were likely to deceive reasonable consumers, including Plaintiffs and the other members of the Class, by obfuscating the nature, quality, and/or ingredients of the Falsely Labeled Products, in violation of the "misleading" prong of the FAL and similar statutes.

259.   The business practices alleged above are unlawful under the CLRA and similar statutes, which forbids misleading and deceptive advertising.

260.   Plaintiffs and the other members of the Class have suffered injury in fact and have lost money or property as a result of J&J's violations of the FAL and similar statutes.

261.   As a result, J&J has been unjustly enriched at the expense of Plaintiffs and the other members of the Class.  Plaintiffs and the Class, pursuant to California Business and Professions Code § 17535 and similar statutes, are entitled to an order of this Court enjoining such future conduct on the part of J&J, and such other orders and judgments which may be necessary to disgorge J&J's ill-gotten gains and restore to any person in interest any money paid for its Falsely Labeled Products as a result of the wrongful conduct of J&J.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## COUNT 5

**Violation of California's Unfair Competition Law and Similar Statutes**
***On Behalf of the Nationwide Class and, in the alternative, the California Class***

262.   Plaintiffs repeat and reallege all prior allegations as if set forth at length herein.

263.   Plaintiffs Rugg and Fish bring this cause of action pursuant to California's Unfair Competition Law (the "UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.* and similar statutes.

264.   By committing the acts and practices alleged herein, J&J has engaged

in deceptive, unfair, and unlawful business practices in violation of the UCL and similar statutes.

265.   Plaintiffs have standing to pursue this claim as they have suffered injury in fact and have lost money or property as a result of J&J's actions as set forth above.  Class members also have suffered injury in fact and have lost money or property as a result of J&J's actions as set forth above.

266.   The violation of any law constitutes an "unlawful" business practice under Cal. Bus. & Prof. Code § 17200 and similar statutes.

267.   Each of J&J's false representations alleged herein violates 21 U.S.C. § 331; Cal. Civ. Code § 1709; Cal. Civ. Code § 1750 *et seq.*; and Cal. Bus. & Prof. Code § 17500 *et seq., and* similar statutes.

268.   J&J has violated the UCL's proscription against engaging in unlawful conduct as a result of its violations of (i) the CLRA and similar statutes, as alleged above, and (ii) the FAL and similar statutes, as alleged above.

269.   In addition, J&J has violated the UCL's proscription against engaging in unlawful conduct as a result of its violations of the Sherman Law, Cal. Health & Safety Code § 109875 *et seq.*, and similar statutes, which forbid (1) misbranding of any cosmetic, *id.* at §§ 110398 and 111445, and (2) manufacturing, selling, delivering, holding, or offering for sale any cosmetic that is misbranded or delivering or proffering such for delivery.  Cal. Health & Safety Code §§ 110390, 110395, 110398, 110400, 110550, 110585, 110620, 110625, 110660, 110770, 110705, 110740, 110760, 110765, 110770, 111445, and 111450.

270.   The Sherman Law defines a "person" as "any individual, firm, partnership, trust, corporation, limited liability company, company, estate, public or private institution, association, organization, group, city, county, city and county, political subdivision of this state, other governmental agency within the state, and any representative, agent, or agency of any of the foregoing." Cal. Health & Safety Code § 109995.  J&J is a "person" within the meaning of the Sherman Law.

271. As more fully described herein, J&J's misleading marketing, advertising, packaging, and labeling of the Falsely Labeled Products is likely to deceive a reasonable consumer. Indeed, Plaintiffs and the other Class members were unquestionably deceived regarding the characteristics of J&J's Falsely Labeled Products, as J&J's marketing, advertising, packaging, and labeling of the Falsely Labeled Products misrepresents and/or omits the true nature, quality, and/or ingredients of the Falsely Labeled Products.

272. There is no benefit to consumers or competition from deceptively marketing and labeling products. Indeed, the harm to consumers and competition is substantial. Plaintiffs and the other members of the Class who purchased the Falsely Labeled Products suffered a substantial injury as alleged herein.

273. Plaintiff and the other members of the Class who purchased the Falsely Labeled Products had no way of reasonably knowing that the Falsely Labeled Products they purchased were not as marketed, advertised, packaged, and labeled. Thus, they could not have reasonably avoided the injury each of them suffered.

274. J&J's acts and omissions alleged above constitute unfair business practices under Cal. Bus. & Prof. Code § 17200 and similar statutes because the gravity of the consequences of J&J's conduct as described above outweighs any justification, motive, or reason therefor, particularly considering the available legal alternatives which exist in the marketplace, and such conduct is immoral, unethical, unscrupulous, offends established public policy, or is substantially injurious to Plaintiffs and the other members of the Class. J&J's false and misleading representations and omissions also violate legislatively declared policy as they have violated numerous state and federal laws. Moreover, the gravity of the harm to Plaintiffs and Class members resulting from J&J's conduct outweighs J&J's legitimate reasons, justifications and/or motives for engaging in such deceptive acts and practices

275. Each false and misleading representation and omission constitutes

fraudulent business practices under Cal. Bus. & Prof. Code § 17200 and similar statutes because the representations and omissions were false. Even if these representations were true, J&J's representations and deceptive concealment were nonetheless fraudulent under the statute because they were misleading and were likely to and did deceive the reasonable consumer, including Plaintiffs and the Class members.

276. J&J's violations continue to this day.

277. Pursuant to California Business and Professions Code § 17203 and similar statutes, Plaintiff and the other members of the Class seek an order of this Court that includes, but is not limited to, an order enjoining such future conduct on the part of J&J and such other orders and judgments which may be necessary to disgorge J&J's ill-gotten gains and to restore to any person in interest any money paid for J&J's Falsely Labeled Products as a result of the wrongful conduct of J&J.

WHEREFORE, Plaintiffs pray for relief as set forth below

## COUNT 6

**Violation of New Jersey Consumer Fraud Act, N.J.S.A. § 56:8-1 *et seq*.**
***On Behalf of the Nationwide Class and,***
***in the alternative, the New Jersey Class***

278. Plaintiffs repeat and reallege all prior allegations as if set forth at length herein.

279. Plaintiff Sanchez brings this cause of action pursuant to the New Jersey Consumer Fraud Act ("CFA"), on Plaintiffs' behalf and on behalf of the Class and New Jersey Class.

280. The CFA explicitly and without qualification outlaws "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact … in connection with the sale or advertisement of any merchandise or real estate … whether or not any person has in

fact been misled, deceived or damaged thereby, is declared to be an unlawful practice." N.J.S.A. § 56:8-2.

281.   The Falsely Labeled Products constitute "merchandise" within the meaning of the CFA, N.J.S.A. § 56:8-1(c).

282.   Defendant is a "person" within the meaning of the CFA, N.J.S.A. § 56:8-1(d).

283.   Defendant has violated the CFA as it has used and employed unfair and deceptive practices in connection with sale of the Falsely Labeled Products, as described herein.

284.   Defendant's business practices constitute unconscionable commercial practices, deception, fraud, false promises, false pretenses and/or misrepresentations in its interactions with Plaintiffs and those similarly situated, in violation of the CFA.

285.   Plaintiffs and those similarly situated suffered ascertainable losses as described herein.

## COUNT 9

**Violation of New Jersey Truth-in-Consumer Contract,
Warranty and Notice Act, N.J.S.A. § 56:12-14 *et seq.*
*On Behalf of the Nationwide Class and,
in the alternative, the New Jersey Class***

286.   Plaintiffs repeat and reallege all prior allegations as if set forth at length herein.

287.   Plaintiff Sanchez brings this cause of action under the New Jersey Truth-in-Consumer Contract, Warranty and Notice Act, N.J.S.A. § 56:12-14 *et seq.* ("TCCWNA"), on Plaintiffs' behalf and on behalf of the Class and New Jersey Class.

288.   TCCWNA provides in relevant part that "(n)o seller ... shall in the course of his business offer to any consumer or prospective consumer or enter into any written contract or give or display any written consumer warranty, notice or sign ... which includes any provision that violates any clearly established legal right of a

consumer or responsibility of a seller ... as established by State or Federal law at the time the offer is made or the consumer contract is signed or the warranty, notice or sign is given or displayed."  N.J.S.A § 56:12-15.

289.   Plaintiffs are each a "consumer" within the meaning of TCCWNA.

290.   Defendant is a "seller" within the meaning of TCCWNA.

291.   Defendants' Falsely Labeled Products, described above, display a notice that the Products are hypoallergenic, when they are not.

292.   The false notice that the Falsely Labeled Products are hypoallergenic violates the legal rights of the Class members and the responsibilities of Defendant.

293.   The above described labels and notices violate New Jersey law as unconscionable commercial practices, deception, fraud, false promises, false pretenses and/or misrepresentations.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs demand judgment on behalf of themselves and the proposed Classes providing such relief as follows:

A.   Certification of the Classes proposed herein under Federal Rule of Civil Procedure 23(a), (b)(1), (b)(2), and (b)(3); appointment of Plaintiffs as representatives of the Nationwide Class; Plaintiffs Rugg and Fish as representatives of the California Class; Plaintiff Sanchez as representative of the New Jersey Class; and, appointment of the undersigned counsel as counsel for the Classes;

B.   A declaration that J&J is financially responsible for notifying members of the Classes of the pendency of this suit;

C.   An order requiring an accounting for, and imposition of a constructive trust upon, all monies received by J&J as a result of the unfair, misleading, fraudulent, and unlawful conduct alleged herein;

D.   Restitution, disgorgement, refund, and/or other monetary damages, together with costs and disbursements, including reasonable attorneys' fees pursuant to the applicable statutes and prejudgment interest at the maximum rate allowable

by law;

E.      Injunctive relief on behalf of the Classes, enjoining J&J's unlawful and deceptive acts;

F.      Statutory damages in the maximum amount provided by law;

G.      Punitive damages in accordance with proof and in an amount consistent with applicable precedent; and

H.      Such further relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs and the Class members hereby demand a trial by jury.

DATED: November 30, 2017                    Respectfully submitted,

_/s/ James A. Francis_
**FRANCIS & MAILMAN, P.C.**
James A. Francis (*pro hac vice*)
David A. Searles (*pro hac vice*)
100 South Broad Street, Suite 1902
Philadelphia, PA 19110
Tel. (215) 735-8600
Fax. (215) 950-8000

Stephanie R. Tatar
**TATAR LAW FIRM**
3500 West Olive Avenue
Suite 300
Burbank, CA 91505
Tel. (323) 744-1146
Fax. (888) 778-5695

**THE GOLAN FIRM**
Yvette Golan (*pro hac vice*)
1712 N Street, NW, Suite 302
Washington, D.C. 20036
Tel: (866) 298-4150, ext. 101
Fax: (928) 441-8250

**TURKE & STRAUSS, LLP**
Samuel J. Strauss (*pro hac vice*)
613 Williamson Street #209
Madison, WI 53703
Tel: (608) 237-1775
Fax: (608) 509-4423